**STATE of Iowa, Plaintiff–Appellee,**

v.

**Timothy K. PALMER, Defendant–Appellant.**

No. 95–2083.

Court of Appeals of Iowa.

June 26, 1997.

Rodney J. Ryan of Duffy, Spellman, Ryan, Thomas & Clark, Des Moines, and Jeanne K. Johnson, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, John P. Sarcone, County Attorney, and Steve Foritano and Michael Hunter, Assistant County Attorneys, for appellee.

Heard by HABHAB, C.J., and CADY and VOGEL, JJ.

VOGEL, Judge.

Timothy K. Palmer appeals judgment and sentences entered, following jury trial, for first-degree murder, in violation of Iowa Code sections 707.1 and 707.2(1) and (2) (1995), and first-degree robbery, in violation of Iowa Code section 711.1(1).

**Facts.** The beaten and bound body of Yuval Kedem was found in an area known as the "Lost Planet" in Des Moines on June 19, 1995. His credit card had been used at various stores in Kansas City on June 19, 1995, and his BMW was discovered in a ravine in Kansas City on June 21, 1995.

On June 22, 1995, Jamie Strasser offered information regarding Kedem's death. She implicated several people, including the defendant, Timothy K. Palmer. Based upon her information, officers applied for a search warrant. On the search warrant application, officer Reynolds listed Strasser as an informant and stated there was no known reason for her to fabricate the information she provided to the officers.

Strasser, Akbar Choudry, Robert Wright, Amanda Payne, and Defendant Palmer were charged with first-degree murder and first-degree robbery by trial information on July 27, 1995. The State alleged they killed Kedem and stole his credit card and BMW. The State charged the parties as principals and as aiders and abettors. The court subsequently overruled Palmer's motion to suppress evidence seized pursuant to the search warrant and his statements to law enforcement officers. The court also severed the trials.

The jury returned guilty verdicts. The court overruled Palmer's motion for new trial. On November 22, 1995, Palmer was sentenced to life imprisonment for first-degree murder, and a twenty-five year term for first-degree robbery.

**I. Corroborative evidence.** Palmer asserts there was insufficient evidence to corroborate the testimony of the accomplice, Amanda Payne, and that the district court erred in failing to grant directed verdicts for

acquittal. Our review of this matter is for errors of law. *State v. Jones,* 511 N.W.2d 400, 404 (Iowa App.1993).

Payne struck a plea agreement with the State in exchange for her testimony against the remaining parties. At trial in October 1995, Payne testified to the following: On June 17, 1995, Kedem picked up Payne, Strasser and Choudry in the loop area of Des Moines, and they went to his apartment. At the apartment, Kedem was assaulted, apparently by Choudry and Wright. Defendant Palmer eventually came to the apartment, and then left with Payne. The next day, Choudry, Wright, and Palmer drove Strasser and Payne back to Kedem's apartment. Choudry told them to bring him to the Lost Planet later that night. Choudry planned to assault Kedem and steal his money. Palmer was present when this plan was made. After arriving at the Lost Planet, Choudry, Wright, and Palmer emerged from the bushes. Choudry and Wright were wearing bandannas and attacked Kedem. Payne testified Palmer stood by a fence while Choudry and Wright beat Kedem for ten to fifteen minutes. Payne's testimony does not rule out the fact Palmer may have inflicted some of the blows. She admitted she had not observed the entire beating, and was not in close proximity to the beating as she "ran around beside" some bushes. Strasser and Payne then left in Kedem's BMW and Palmer, Choudry, and Wright left in Palmer's car, and went to Choudry's apartment where Choudry and Wright changed clothes. They all drove to Kansas City, and used Kedem's credit card at various stores. They returned to Des Moines on June 19, and after learning of Kedem's death, Palmer, Payne, and Wright drove back to Kansas City to move the BMW. Palmer received two traffic citations on the return trip to Kansas City, and told the officer he was Choudry.

■ We find there is sufficient evidence in this case that effectively corroborates Payne's testimony. It is firmly grounded in Iowa case law that a small amount of corroborative evidence is all that is required. *See Jones,* 511 N.W.2d at 404 (citing *State v. Vesey,* 241 N.W.2d 888, 890 (Iowa 1976), and stating corroborative evidence need not be

strong). The only requirement is that it must support some material part of the accomplice's testimony, thereby "tending to connect the defendant with the commission of a crime." *Id.*

■ Payne's testimony was corroborated by a substantial amount of evidence, exceeding the degree of corroboration needed for conviction. Two independent witnesses saw Palmer in the company of one or both of the other male assailants at a parking garage downtown at the end of the "loop" minutes before the murder. One of them saw the three men in a car, and Palmer was the driver. One of the witnesses believed it to be Palmer's car. Independent evidence that a defendant was seen in the company of other perpetrators shortly before the crime corroborates accomplice testimony. *State v. Hollins,* 397 N.W.2d 701, 703–04 (Iowa 1986).

■ Palmer argues all evidence discovered after the murder is irrelevant for purposes of corroboration; however, this misstates the law. Events after a crime, including "a defendant's possession of property stolen in the alleged offense is corroborative evidence." *State v. Dickerson,* 313 N.W.2d 526, 529 (Iowa 1981).

■ Additionally, several days after the murder, a police officer traveled to the Kansas City mall where the victim's credit card had been used. Two clerks identified Palmer's photograph as being one of the persons seen with the females using the credit card, although admittedly, they were not one-hundred percent certain. This directly corroborates Payne's testimony that Palmer went to Kansas City and participated in the acts of purchasing goods with the victim's credit card. Further, the police search of Palmer's residence revealed two blue and white bandanas, similar to the one left around the victim's mouth, and similar to the ones worn by Choudry and Wright. Police also found items with store tags obtained from the Kansas City mall.

Moreover, independent evidence corroborated Payne's testimony that Palmer received traffic tickets in Missouri on the date he and the others went back to Kansas City to move the victim's car. The State further

presented evidence which indicated Palmer had been observed after the murder wearing clothing purchased in Kansas City.

Finally, there was a photograph taken of Palmer's right hand several days after the murder. There were abrasions on his thumb and around his knuckles. Medical evidence revealed the victim's death was due to an infliction of blows to the head, likely by the use of fists.

Thus, we find substantial corroborative evidence exists supporting Payne's testimony. We accordingly find the district court correctly denied Palmer's motion for judgment of acquittal.

■ *II. Motion to suppress.* Palmer argues the district court erred in failing to grant his motion to suppress as the search warrant authorizing searches of his residence, person, and vehicle was invalid. He contends the warrant was invalid because officer Reynolds deliberately or with reckless disregard failed to include information of Strasser's involvement in Kedem's murder as well as information that impeached or contradicted Strasser's version of the events. Our review is de novo. *State v. Gillespie,* 503 N.W.2d 612 (Iowa App.1993). Palmer must demonstrate deliberate, false, or reckless disregard for the truth. *Id.; Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667, 682 (1978). Palmer does not establish, nor does the record indicate, the search was not valid in this regard. The district court correctly found the information Strasser gave to the officer was corroborated by a substantial amount of other evidence. We determine the facts in this case support a valid search was conducted, and thus, no fourth amendment violation occurred. Even if we suppress the information as Palmer urges us to do, we are left with an overwhelming amount of evidence in the record establishing Palmer's guilt. We therefore find this claim without merit.

■ *III. Ineffective assistance of counsel.* Palmer claims defense counsel was ineffective for (1) failing to object to the joint criminal conduct jury instruction, and (2) failing to re-open the evidence to further cross-examine Payne, a State's witness, about a letter she had written. Our scope of review is de novo as we review the totality of the circumstances relating to counsel's conduct. *State v. Keesey,* 519 N.W.2d 836, 838 (Iowa App.1994).

■ Our principle concern with claims of ineffective assistance of counsel is with the " 'fundamental fairness of the proceeding whose result is being challenged.' " *Keesey,* 519 N.W.2d at 837 (quoting *Strickland v. Washington,* 466 U.S. 668, 696, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674, 699 (1984)). When reviewing the totality of the circumstances relating to counsel's conduct, we start with the presumption counsel performed within the normal range of competence. *State v. Risdal,* 404 N.W.2d 130, 131 (Iowa 1987). The burden rests with the defendant to prove by a preponderance of the evidence that (1) counsel failed to perform an essential duty, and (2) prejudice resulted. *Risdal,* 404 N.W.2d at 131–32.

*A. Jury instruction.* Immediately preceding the instruction on aiding and abetting, the jurors were given a uniform instruction on joint criminal conduct. Palmer first asserts there were no facts in this case that warrant an instruction of joint criminal conduct. We disagree.

Iowa Code section 703.2 (1995) defines "joint and criminal conduct" as:

> When two or more persons, acting in concert, knowingly participate in a public offense, each is responsible for the acts of the other done in furtherance of the commission of the offense or escape therefrom, and each person's guilt will be the same as that of the person so acting, unless the act was one which the person could not reasonably expect to be done in the furtherance of the commission of the offense.

*Id.* Iowa Code section 703.1 (1995) contains the definition of "aiding and abetting," to-wit:

> All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals. The guilt of a person who aids and abets the commission of a crime must be determined upon the facts which show the part

the person had in it, and does not depend upon the degree of another person's guilt. *Id.*

■ The instructions on each alternative theory of guilt—in this case aiding and abetting, and joint criminal conduct—are appropriate in the same case when supported by the evidence. *See State v. Satern,* 516 N.W.2d 839, 843 (Iowa 1994); *Kyle v. State,* 322 N.W.2d 299, 307 (Iowa 1982). The State had two possible theories upon which it could rely in proving Palmer's guilt: as the actual perpetrator, or under the felony-murder rule.

■ Under both theories, the jury was permitted to find Palmer guilty as a principal or as an aider and abettor. It is proper to use the aiding and abetting analysis to support a felony-murder conviction. *State v. Conner,* 241 N.W.2d 447, 462–63 (Iowa 1976). Although the charging instruction in this case does not actually utilize the joint criminal conduct analysis, it is equivalent to the felony-murder rule when a murder is committed while the felony, in this case robbery, is being perpetrated by co-felons. *See Conner v. State,* 362 N.W.2d 449, 455 (Iowa 1985). Thus, Palmer could not have been prejudiced by the instruction. The charging instruction properly guided the jury in reaching its verdict. Furthermore, the differences between the two theories of aiding and abetting and joint criminal conduct are adequately explained in the two definitional instructions submitted on the respective theories of guilt.

■ Therefore, Palmer has failed to show counsel breached an essential duty in failing to object to this instruction since it was properly submitted in this case and no prejudice resulted.

■ *B. Re-calling a witness.* Palmer also contends his counsel was ineffective for failing to recall for further cross-examination, prosecution witness, Payne, when he discovered she had written a 135–page letter regarding the surrounding circumstances of the murder. Counsel reviewed the letter before the close of evidence and made a tactical determination that it would be pointless to recall Payne for further cross-examination.

He explained that the letter was written before the witness entered her negotiated plea agreement, and it appeared to be fairly consistent with the statements she gave in deposition and at trial. The letter was not admitted into evidence, and accordingly was not before the court. Further, Palmer fails to show counsel performed below the normal range of competency in declining to recall Payne. We accept counsel's tactical judgment that further cross-examination would have been futile, or superfluous. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65, 80 L.Ed.2d at 695 (stating that courts should defer to counsel's challenged actions grounded in sound trial strategy); *see State v. Rice,* 543 N.W.2d 884, 888 (Iowa 1996) (holding counsel did not breach any duties by failing to ask certain questions on cross-examination when counsel's cross examination was deemed competent).

Neither is it the case Palmer was prejudiced by counsel's failure to recall a witness as he could not establish a further cross-examination of Payne would have resulted in Palmer's acquittal of first-degree murder. For the foregoing reasons, we reject Palmer's ineffective assistance of counsel claims.

Having carefully considered all arguments on appeal, we affirm the district court and uphold Palmer's convictions.

**AFFIRMED.**